Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. I want to welcome everyone to the Fourth Circuit Court of Appeals this morning. I'm sorry for the delay, but we had to gather together for a few minutes downstairs. We have two cases here, good lawyers. We look forward to it. U.S. Med Supplies v. Geri-Care. Mr. Farrell? Yes, Your Honor. Good to have you with us. Good to be here again, Your Honor. A short thumbnail sketch of this case. My client, the plaintiff, reached agreement with Geri-Care, the defendant, to be the sole and exclusive supplier to Saudi Arabia of products distributed by Geri-Care and made available to U.S. Med. It only took two weeks for that exclusive agreement to be interrupted by an exclusive agreement agreed to between Geri-Care and another distributor, Gulfstream. There's a quote in this case that's very important in the testimony of the Executive VP Sales Manager for Geri-Care, Mr. Friedman. Mr. Friedman has testified, this case will be determined by whether the court decides Geri-Care, the defendant, had a contract with U.S. Med, the plaintiff. I would agree with Mr. Friedman's prognosis of this case, and a valid contract was deemed to exist with regard to U.S. Med, the plaintiff, being the sole agent for the export of Geri-Care products to Saudi Arabia. All sales of calcium carbonate, specific product of Geri-Care, would be exclusive to the plaintiffs in Saudi Arabia. That agreement was for the period September 1, 2015 through August 31, 2016, may be renewed annually. The record establishes, and I may get to it a little bit later, that all of the evidence points out that this contract would have been renewed. Mr. Hussain testified that he believed it would be renewed. Geri-Care had entered into a contract with my client in 2015, the exclusive agreement, and again in 2017, another exclusive agreement for the distribution of calcium carbonate to Saudi Arabia. There's no fact that establishes, for any reason, that the contract would not have been renewed. The district court ruled that you sued too late. Can you talk about that? Certainly. Statute of limitations in this case. What the district court does is it says that the statute of limitations began to run on September 24, 2017. That was the date of the contract that was entered into between Geri-Care and Healthstream, the other supplier whom they first dealt with, who delivered more than 800,000 bottles of the product we had the exclusive for to Saudi Arabia. There was no basis, factually, for the statute of limitations to begin on the date of a contract being entered into that we had no idea even existed for another two years. Under the discovery rule, which is the law of the state of Connecticut, Chisholm versus Campania, which is cited extensively in our brief, until we discover the wrong, the statute doesn't begin to run. Do you agree that the North Carolina discovery rule is until you discover the wrong, a reasonable person should have discovered the wrong, right? I agree with that, yes. And we have this October letter saying we have reason to believe there might be a breach coming. Please send us a notification that you're not going to breach. That sounds like you're saying we have a reasonable person would think there might be a breach as of October 15th. In response, I'd say having the letter in front of me, the letter does not say we believe there's a breach. We believe that someone may come looking for product. Right, and then you ask them to please reply and assure us within seven days that you will not breach the contract. Did they reply to that? No. Interestingly enough, they didn't reply to it because the Mr. Friedman I just identified as being the executive VP of sales at Jerry Care testified we don't like to aggravate our customers. Yeah, but your argument has to be, I assume, that they didn't reply to the letter saying please assure us you're not going to breach. That would not put a reasonable person on notice that they should think something like a breach had happened. I don't agree with that. There was no breach. Excuse me, go ahead. I'm just saying your argument has to be, it seems to me, that a reasonable person would not have reason to think that when the letter saying please assure us you're not going to breach was not replied to, that no reasonable person would think that means a breach is happening. I don't believe any reasonable person would think there was a breach. So why is that? It's the fact of the breach. The knowledge of anything occurring. There's nothing. I thought we agreed just a minute ago the discovery rule is not just about when you like when the the breach is actually discovered. It's also when a reasonable person should have discovered it. Yeah. You can't discover a breach that hasn't happened. That's what I'm saying. That's my position. At that point in time there was no evidence that we knew about the separate agreement that was reached two weeks later with another distributor. We didn't come to know that discovery in this case. What about the October 9th 2015 email that was erroneously sent to your client suggesting or proving perhaps it actually the there was a contract with another company? Why isn't that knowledge? That's a JA1402. That's the email that was sent to the U.S. Med account email. The same account used by the HealthStreams as the manufacturer. Why isn't that notice of the breach? Well this was sent on January 26, 2017. I think the email of what the document I have in front of me JA1402 is dated October 9th 2015. That's not the one I have. If you would give me the page number. The page number I'm looking for begins with 1386, goes to 1387, then 1250 and 1252. JA1402 is in purchase order. Erroneously it appears sent to your client to HealthStream LLC from RACA. Okay. And it seems to me that that would be notice of the breach. No, we didn't get that until we got the other document from 2017. That was one of the documents that's attached. That talks, that's, you're talking about JA1252 your honor? 1402. It's an invoice from October 9th 2015. From whom? From whom to whom? It is to HealthStream from RACA, but it was erroneously sent to an email belonging to your client, or so it appears. I don't believe that occurred. I don't have it in front of me and I will have it here in front of me to testify, to comment on when I get back for please. So in addition to the discovery rule, we have the continuing wrongs statute of limitation requirements. And in that, the statute does not begin to run until the end of the wrongs are or have occurred. The last wrong occurred on July 27th 2017. So that was well, we're well within the statute of limitations of three years, four years for the deceptive trade practice and three for all of the other claims in this case. And there's no evidence, and I will look at that document your honor, there's no evidence that we knew of anything before we got the sampliner documents that talked about a claim by RACA, the Saudi Arabia distributor, against HealthStream, the distributor that had been obtained by Gericare and RACA. So under the continuing wrongs doctrines from Williams versus BCBS, which is cited in the brief, until three years after the last wrong, which would have been July of 2000, okay, the statute of limitations is not expired. Sorry, July of when? July 27th, I believe it was. Of what year? 2017. How could that be a violation? I thought the contract ended September 2016. No, the violations occurred prior when we had the exclusivity and during which I believe the record shows it would have, the contract would have been renewed for an additional year. So the wrongs. That's not a breach of an existing contract. That's a different question. The contract we're talking about, the purported is one year and it ends in September 1st, 2016. So no breach of that contract could occur after September 1st, 2016. Well, our claim, I understand your argument. Our claim is that the contract would have been renewed, but the breaches continued, the sales. I understand what you're saying. So you're arguing for the continuing violation doctrine to apply to a hypothetical future contract that the parties may have entered. You think the evidence shows they would have chosen to contract again and this would have been a breach of that contract had they made it. And so the continuing violation doctrine applies to a different contract? No, the renewal of the same contract that would have gone through. But how does that continue the breaches of the contract that ended in September, 2016? Well, that contract would have been renewed with a new different, with a new term. What was the whole, no, the contract says it will be renewed. Well, doesn't it say it may be or can be renewed? It was not obligatory, but our expectation, the evidence, so it's a hypothetical renewal. It was, it was hypothetical, but the only evidence that it would have been renewed. So there's no evidence that before my clients received the Sampliner documents in January 26, 2007, and they were informed that there was a dispute between Raka and Saudi Arabia distributor and the new distributor here, it wasn't until then that they saw these documents and said, well, there really were contracts, despite the fact that what, what Gericare had done during that whole time was they said, they never said anything about there being a problem with the exclusivity. They cut off all contact with U.S. Med. Gericare never informed U.S. Med that we're going to, we're, we're going to ship it to anyone else in Saudi Arabia. We confirmed, well, we didn't know, excuse me, Gericare said, took the position, we don't know where the product went, a lie. We didn't, they denied sales ever went to Saudi Arabia, which was a lie. They said they never gave GC or their products directly to Saudi Arabia. That was a lie. They did it on two occasions for over 300,000 bottles of that product. There's no evidence that Gericare didn't believe that the contract was valid to us. We didn't know that they treated it as invalid. There's no evidence that USM knew that there were any GC of Gericare sales directly to Saudi Arabia, none. There was no knowledge of that at all. So from a limitation standpoint, both on the discovery rule and on the continuing wrongs rule, the statute doesn't run until after we sued in January of 2000. The statute of limitations again is four years with the deceptive trade practice, three years with all others. With regard to the damages, those damages are based upon non-speculative matters that Mr. Hussain's testimony completely verifies. With regard to the damages, there's no contrary evidence in the record. There's nothing speculative. The format itself is simply what it cost USMed to buy, what they got when they sold it, multiplied by the volume in question. That's the format. No one has addressed the format. That's not a speculative format. If anyone has a dispute with the numbers, then come up and let us know. No one has provided anything in the statement of undisputed facts alleged in which there are violations, which I'll get to in a second. Are you using your rebuttal time now? No, I'm not. I don't intend to, Your Honor. Yes, I understand. The red light means it's your time's up. Okay, I'm done. Thank you. You can use your rebuttal time for what you want. No, that's all right. I'll rebuttal. Thank you very much. You've saved some time. Mr. Novak. Is this yours? Yeah. Okay, thanks. Good. I think it's still morning. I have a cold. It's not COVID. I went to the doctor, and it's not a flu. But I'm going to, with the court's permission, I do have a bottle here. I will drink it. Thank you. I appreciate that. Also, I did appreciate coming early to hear your en banc. That was an excellent time spent here. I want to just jump into one of the issues, which is on the top of your page, that you're interested in. I'm not here to defend Judge Flanagan's opinion that Chisholm didn't overrule or modify North Carolina law. But I want to say that I thought she wrote an excellent opinion, because what she did do in her footnote 9 was say, I don't think that it's appropriate in a contract dispute. But even if it would be appropriate in a contract dispute, I don't think it's appropriate in this contract dispute. So I don't think that Judge Flanagan ignored Chisholm. And I think that footnote says that she then, for the next eight pages or seven pages, said here's all the reasons why this plaintiff, Raj Hussain, knew a lot that was going on. I call this case the Rope-A-Dope case. My client sells pills to anybody who calls up and wants to pay for the pills. What Raj Hussain said in his deposition that he's been doing these things in Saudi Arabia since 2004. He said that he knows everything that's going on. He knows he has contacts. He knows how it works. He also said that who gets an award is all public information in Saudi Arabia. And he knew in April of 2015 that his price was too high for the calcium carbonate. He had some other things that they accepted. He knew that, despite that, in September 1st, 2015, let me get the dates right, 2015, he tells my client, I have the contract for the 86 million pills in Saudi Arabia. That wasn't true, he did not have the contract. But he tells them I need a certain piece of paper that is good just to get the license in. So what he did, he then calls them up and says, I need this one, and that's the first one. That's the first September 1st email and letter. Then what happens is, he flies to Saudi Arabia on September 7th, because he's told that his prices are too high, and he's not going to be, without buying it, Raqqa is not going to buy it for that price. So what he does is he calls up my client and says to my client, I need to change this. The Saudi Arabian Ministry of Health says I need to change the language there to give a new letter that says we have a contract and it's good for one year. He testified, he never spoke to anybody in Saudi Arabia. He's not allowed to speak to anybody in the Ministry of Health. He told them they need this one letter to go ahead and get a license, an import license. This is something that foreign countries do need some letters from a manufacturer. He was there on September 7th and 8th, and he was told by Raqqa's Mr. Alamalek that your price is too high, we'll buy some of your stuff, but not the calcium carbonate. But if you don't drop your prices, we're not going to buy from you. They had no obligation to buy him. That's, the court said, there was no exclusivity with Raqqa whatsoever. He said, I don't care, I asked him at the deposition, why don't you just drop your price? So he says, I thought they were bluffing. The district court seemed to think there was a dispute of material fact about whether there was a contract. But the court ruled that this violated the statute of limitations. It was filed too late. Do you want to talk about that? I'm happy to talk about that. I think that what Judge Flanagan said was that either North Carolina law doesn't require the notice period, but I think that's wrong. And I'm not here to argue- She went on to address- She did address it. And so she addressed it with examples I get. She said he had knowledge, the plaintiff said he had knowledge. He said it was public information who got the award. So he knew why in April 2015, who didn't get the award and why Raqqa didn't get it. He said he had knowledge in September, he had knowledge of why Raqqa didn't get the award, and they gave it to somebody else. He said it's all public information. I think if you have public information, it's their duty to go out and see, look at that public information. And he said he did it all the time. He testified, I mentioned many times in my brief, that he said, I didn't have contacts there. Now, I also find that your honor over there said about the email. The email comes out- Can I ask you about that? Sure. Are you relying on that October 9th purchase order? No. It's a purchase order and it's not an email. It's a purchase- It has an email address on it. Right. In your brief you say they must have received it by email. Is there evidence of that? No. So I'm not going to rely only on that. No. But is there evidence they received the email? It's their email address and- But it's not an email, it's just an email address on- Correct, correct. It's not a purchase order. It's an attachment to a, it's page 16 of a 20 page document that's actually from January 2017, right? Yeah, so we were given- It may have been sent, but I just wanted to find out if there's more evidence about it. The district court didn't rely on it, which made me wonder if there was more evidence. Okay, so we got that same piece of paper twice in a discovery. One discovery asked for the documents and that was when it was sent to us and didn't have certain kinds of notations, bait stamps at the bottom. So we got that, then we got it a second time. But I don't think that we are relying on that email as his knowledge. I'm thinking- That's fine. I just want to make sure I know whether we should rely on it or not. I don't- Are you saying anything more than they might have received it? They might have it and I just- Do you have anything more than that right now? No, I don't. At the deposition, there was a lot of times he says, I didn't send you, Mr. Rogers said, I didn't send you this email. I have a bunch of more emails. But what he did testify was that he's been in the business since 2004, that a lot of this stuff is public information. Even to know who, what the manufacturer, what the suppliers are. And he knew on September 7th when Mr. Amalik said to him, I'm not buying that stuff from you. I can go to somebody else. And then, I think he got the email, but I don't have proof. But five days later, seven days later, we got the attorney's letter. I don't think my client had any obligation to respond to that attorney's letter. This is not a situation was if I do share a relationship between my client and his client. So I don't have an obligation to do it. Secondly is that he called up about, I don't know, in December, the date of December 15th. So that October 15th letter is the one where the attorney said, tell us in seven days, you're not going to breach. And your client didn't say anything in response. That's right. And I think that- It's bad form. Well, that's why they hire lawyers. It's discourteous. It is discourteous. And if they didn't hire lawyers, if they hired lawyers before, maybe I would never be here. And this case would have never gone. It was discourteous. However, I do think that it shows the plaintiff that he's not abiding by it or he's not responding and saying, yeah, sure, we understand it. Then in December 15th, there's a conversation, there's an email from Mr. Hussan that says, I want to maybe buy some more of this calcium carbonate. And my client says, well, which country are you sending it to? And he says that, well, I'm sending it to Saudi Arabia. We have an exclusive relationship. That conversation ends, and they have no more response back and forth. So is there a lack of courteousness? Yes, but do I think that there's an obligation, fiduciary obligation? Was it fraud? No, my client did not believe that it really had a contract exclusivity because Mr. Hussain never came through in the letter. It says, we have a contract. That contract wasn't the exclusivity contract. That was the contract that he was supposed to have, which is how many pills you're buying and how much you're buying it for. So when Mr. Hussain found out on September 9th, while he was in Saudi Arabia, that he's not going to get the contract, he didn't call up my client and say, I don't have the contract. But he thought that he would just hold on to this September 9th email, though it's dated September 1st. And so that at some time later, even after he does business with my client in 2018 and 19 and buys pills, he will sue him. And that's what he did here. I think he waited too long. The exclusivity contract was only through either August 31, 2016, or September 1, 2016. You have a three year statute of limitations down in North Carolina. So he didn't sue until the summons and complaint, which is in 2020. Why isn't the continuing violation rule applied? So first thing, okay, the continuing violation rule will apply, as I understand it, is that there's a series of, you have this case that we have a series of different things they're doing. Not that there's one contract and it's just different tranches of payments and stuff. But I think the only violation with regard to Health Stream, that all occurred within that one year period. And what plaintiff or appellant wants to do is says, no, well, we would have renewed that contract. And then for that contract period of 2016, 2017, you're selling it to other parties, not Health Stream because the Saudi Arabians didn't pay the money to Health Stream. And because they didn't pay the money to Health Stream, that contract also blew up. Which is the reason why, with regard to the computation of lost profits, it's so nebulous. It's so uncertain. There's so many different parties and players out there that could change their mind. The Saudi Arabian government has the right to change its mind, which at least Mr. Raj Hussain said it happened from time to time. And Mr. Hussain said in testimony, he said, well, I didn't really have a fixed price with my client, Jerry Care. That's something I would have negotiated after I got the contract, meaning after he got the purchase order from RACA. But until he got that purchase order from RACA, he said he would never sign any kind of purchase agreement with my client. Two times I asked him, why didn't you renew what you believe is that lockup period, that exclusivity? He said, well, I really couldn't do it because they would never have agreed because I never bought a contract with them. I never bought any produce from them. So it's not that, maybe I would have done it if this would have happened, none of that happened. And he didn't even call up and say, I want to renew the contract. So I don't think that the theory that the contract could have extended for another two years or something like that, had he done it when he said, I didn't do it. So you can't extend a contract just because you want to in your head. So therefore, since the period of the lockup ended on September 1st, 2016, we really had to bring the lawsuit before 2019. That's a three year period. So they didn't do that, that's our main argument on the statute of limitations. When exactly, on what date do you think they received notice of the breach, or they should have known of the breach? I actually think they knew it before he left Saudi Arabia, because all, this is based on what Mr. Raj Hussain said to us. Everything is public information. Who the supplier is of the produce is public information. So I believe that when he walked out, or got on the airplane and came back to North Carolina, he knew, because we were told by Raka that I'm not, and there's an email like that. I can show you the email that says, we're not buying it from you, we're going to buy it from somebody else. And if it's public knowledge that, meaning he said it's public information in Saudi Arabia, you can go online and see who was awarded the contract. So when do I think the breach occurred? I think the breach probably occurred on my, if that agreement, that one page letter, that September 9th letter, which I don't think it is an agreement, but your honor said it, at least as a question of fact, is an agreement that it would have occurred the first sale that was made to Health Stream. And so, and that, and then it would continue to the last sale to Health Stream, which is in February of 2016. And then, so those would be all the breaches that could have occurred, but I don't really, actually don't understand what Mr. Farrell's argument is about the continuing breach after the 2016 lock-up period. I don't know, they didn't have a contract, and the contract was with, no longer with Health Stream, it was with a different company called Pharma Med. I don't really understand how that all plays here. I think that the statute of limitations is pretty solid argument that, at best, it had to end when the last sale was made during that lock-up period, and those all ended in 2016. With regard to his claim of the fraud, generally, I don't think, the fraud in a contract is really very, very unusual that courts ever feel that way. Moreover, I don't think my client had an obligation to talk to him. My client was probably pretty unhappy with him, that he calls him up and makes him crazy, and says, I'm going to do this and do this. We have a contract, and then he just disappears after September 9th, and doesn't call him back and say, I didn't get a contract, maybe next time. So, with regard to your honor, about courtesy, okay, there's a lot of, I guess, non-courtesy in business. However, two years later, when he now knows already that my client sold everything to Health Stream for that one year period, has no problem going back to Jerry Care, entering to another agreement to sell 58 million pills. I see that, I have more time, but that's our case. I mean, as I said, we're sticking with the statute of limitations, and even if we lose on the statute of limitations, your honor said, I think, quite well, that there's no way that there's going to be any kind of damages of loss of profit on this. North Carolina seems to say nominal damage is only in case of fraud or breach of fiduciary liability. And there are no cases that say, when you have two competitors or two business people that have no relationship, that they have to respond to each other, that quiet silence is deemed to be fraudulent. So, thank you very much. I am finished. I have a little extra time. Thank you very much. Thank you. Good to have you with us. It's a pleasure. I'm glad I came down here. Mr. Buckmiller? May it please the court, Matt Buckmiller for the defendant Rocca. Our initial position is that the plaintiff has waived all arguments as to the propriety of the granting of the motion to dismiss as to Rocca for failure to raise any of those issues in its appeal. The only, there's numerous claims that were dismissed by the trial court. A tortious interference with contract, Chapter 75 claim, breach of fiduciary duty, and additional claims as well. The only argument that appears to be somewhere in the appellant brief has to deal with a tortious interference with contract claim. There is no argument whatsoever as to any of the other claims that were dismissed by Judge Flanagan. And according to this court's rulings in Southeastern Public Safety Group, US versus Bailey, Mod Perfections versus Bank of America, you need to develop your argument. And if you don't develop your argument, you have to give it more than a passing shot. And if you don't give it more than a passing shot, then the argument needs to be, is waived. So we contend, first off, that the appellant has waived all of its arguments to contest the granting and the propriety of the granting of the motion to dismiss. And they didn't dispute that in the reply, right? You said that in the red brief, and then in the reply, they didn't come back and say, no, you missed a giant place where we argued tortious interference. Correct, it's been absent. And I will just remark briefly on the tortious interference claim. I'm not going to get into the damages issues or the statute of limitations as to a breach of contract. What I will say is the statute of limitations for a tortious interference claim with contract is still three years under North Carolina law. And it is not subject to the discovery rule. There has not been a case at the Supreme Court since Chisholm versus Campana, which I happily represented them both in different cases. But that is still the law in North Carolina, that there's no discovery period under the tortious interference with contract claim. I will also note that, as the court had indicated, the contract was for a year. So the contract would have expired September 1st, 2016. The lawsuit was filed 123 of 20. So that is way past the three year period of when they would have had to have filed this lawsuit. The claims in the lawsuit are not for tortious interference with prospective contracts or with prospective contract rights. It's simply a tortious interference with contractual relationship. And also, if you look at the complaint, which is on joint appendix 24, it lists the violations by RACA, this tortious interference that's alleged, occurring from September 21st, 2015 through March of 2015. So it goes back in time before the contract was entered into. Now, even if you were to extrapolate from the record, from the purchase order that we saw, that there was some conduct in October of 2015, that still is way past the statute of limitations on when the action needed to be filed. Thank you. Thank you, Mr. Buckmiller. Mr. Farrell? Thank you, Robert. You got your rebuttal time. With regard to the document 1402, the purchase order you discussed before, Judge Burner, that is an email address that's on another invoice. It's not an email to which this document was sent. And there's no proof that my client ever received that document. The documents they did receive regarded the dispute between Hellstream and RACA between themselves over performance of the initial contract. That lasted until August 31, 2016. When we talk about the certainty or uncertainty of damages, Your Honor raised a good point about when does the discovery or the continuing violation statute end if the contract ended on August 31, 2016. If damages are determined that don't include any renewal period for damages, then that's a fact determination. It does not make the damage calculation speculative in any way. Matter of fact, it makes them absolutely certain because the contract violations that weren't discovered until later began after the Hellstream contract on the 24th. We never discovered those violations, but during that one year period, the plaintiffs are entitled to what would be determined factually was the period during which they have a right to receive damages. And in that period, they took actual pricing, the actual purchase price, actual sale price that had been agreed to, which is $0.93. They were purchasing for $0.58 from Jerry Care. And at that point in time, the difference between their purchase price and their sale price, since there was no overhead delivery cost as set forth within our statement of undisputed facts, would have the damages were to be continued until and through into August 31, 2016. That would be the period which they had the later discovered violations, and the damages could be computed mathematically, and they're presented within the record. The document page numbers are set forth in our brief. And with that, the additional points they're saying, they've said all along that they could, the Raqqa company that was the original distributor in Saudi Arabia could have purchased the product from any place, well, that's not true because the contract required them to purchase Jerry Care product with regard to the governmental entity and Raqqa, and the record is clear on that. Lastly- Can I ask you just to follow up on Raqqa's presence here at Oral Argument? Are you appealing any issue other than the breach of contract and the UTPA ruling? With regard to Jerry Care? With regard to anybody. The district court ruled on all your claims, but in your brief I just saw you challenging the district court's breach of contract ruling and UDPA ruling. Is that right? You mean the Deceptive Trade Practices? Yes, that's right. Sorry, it's a lot of letters. Yeah. I believe that's true with regard to the breach of contract and the Deceptive Trade Practice Act, we're pursuing those, as well as the fraud. We're claiming the fraud claim as well, but fraud is part of the DTVA claim. Fraud is your, the unfair act that you're claiming for unfair and deceptive trade. That's correct. But no other claims are you appealing? Right. Okay. So far as whom the purchases had to be made by, the purchases in question that violated the contract were all, all comprised, each comprised a breach of the contract. If we just take the period, without considering renewals, if we just took the period September 1, 2015 through August 31st, 2016. They couldn't, we had a right to get pricing and sales from any sales that went to Saudi Arabia, our exclusive sales. And the sales that were made were the sales that are in dispute today. Sales by Jerry Care to another distributor for distribution in Saudi Arabia. We know what those volumes are, but we're entitled also to what the agreement was in the volumes that were to be required to be delivered to Raqqa in Saudi Arabia and to the Saudi Arabian Minister of Health. There are comments made about public records that were available to the plaintiffs. There's no evidence in the record that any of those public records were ever available actually publicly. There's no public records that evidenced the issuance of a contract to, or any type of contract that would have given us notice that our rights under contract were violated. And this was the problem with regard to the statement of material facts that the parties respectively filed. All we received was a comment that said, a response that said, dispute, we dispute this. There was no record evidence there, nothing stated except for one out of 77 disputes. They referenced any evidence. If that's the way the rule is going to be administered for summary judgment, then I don't believe that that's an effective way to implement the intent and purpose of the rules. Thank you. Thank you, Mr. Farrell. I appreciate you being here. We'll come down and re-counsel, and then we'll go to our next case. Okay. Mr. Farrell, it's a pleasure to be here. I don't know if we're going to do this all the time, but thank you for seeing me. Mr. Farrell, it's good to see you. You are a congenial court.
judges: Robert B. King, Allison J. Rushing, Nicole G. Berner